Alfred **BONE SHIRT; Belva Black Lance; Bonnie High Bull; and Germaine Moves Camp, Plaintiffs,**

v.

Joyce **HAZELTINE, in her official capacity as Secretary of the State of South Dakota; Scott Eccarius, in his official capacity as Speaker of the South Dakota House of Representatives; South Dakota House of Representatives; Arnold Brown, in his official capacity as President of the South Dakota Senate; and South Dakota Senate, Defendants.**

No. CIV.01–3032.

United States District Court,
D. South Dakota,
Central Division.

May 2, 2002.

Patrick K. Duffy, Rapid City, SD, Laughlin McDonald, Bryan L. Sells, Neil Bradley, American Civil Liberties Union Foundation, Atlanta, GA, for Plaintiffs.

John P. Guhin, Sherri Sundem Wald, Attorney General's Office, Pierre, SD, for Defendants.

Cheryl Schrempp Dupris, U.S. Attorney's Office, Pierre Office, Pierre, SD, Gaye L. Tenoso, R. Tamar Hagler, Department of Justice, Civil Rights Division, Washington, DC, for United States.

Before LOKEN, Circuit Judge, KORNMANN and SCHREIER, District Judges.

## OPINION AND ORDER

SCHREIER, District Judge.

On · November 1, 2001, South Dakota enacted a state-wide legislative redistrict-

ing plan in the wake of the 2000 census. Like its 1991 predecessor, the 2001 Plan divides South Dakota into thirty-five legislative districts, each of which elects one senator to the State's bicameral legislature. Each legislative district, except one, also elects two representatives to the State's House of Representatives. The remaining district is divided into two single-member house districts. Four Native American qualified voters who reside in Districts 26 and 27 commenced this action, alleging that the 2001 Plan must be precleared in accordance with § 5 of the Voting Rights Act of 1965, and that the Plan denies or abridges their right to vote on account of their membership in a language minority in violation of § 2 of that Act. *See* 42 U.S.C. §§ 1973, 1973b(f)(2), 1973c. Plaintiffs moved for a preliminary injunction preventing defendant state officials from implementing certain portions of the 2001 Plan until it has been precleared in accordance with § 5.

The chief judge of the circuit convened this three-judge district court to consider plaintiffs' § 5 claim. *See* 28 U.S.C. § 2284(b); 42 U.S.C. § 1973c. We consolidated their preliminary injunction motion with a trial on the merits of that claim. *See* Fed.R.Civ.P. 65(a)(2). The parties submitted briefs and affidavits and appeared for a lengthy argument hearing at which no testimonial evidence was offered. On the eve of that hearing, the United States moved to participate as amicus curiae, represented by the Voting Section of the Civil Rights Division of the Department of Justice. We granted that motion and have considered briefs submitted by the United States as amicus arguing that the 2001 Plan must be precleared. We now grant plaintiffs limited permanent injunctive relief on their § 5 claim and order the State to submit the plan for preclearance within thirty days.

## I. Background.

Section 5 requires federal preclearance of voting changes in certain state and local jurisdictions. Section 5 initially covered southern states and areas in the north where literacy tests and other discriminatory devices had been used to disenfranchise qualified African–American voters. In 1975, coverage was expanded to include state and local jurisdictions which hold English-only elections if (i) Native Americans or another "language minority" comprise more than 5 percent of the population, and (ii) less than 50 percent of the voting-age citizens were registered to vote or voted in the 1972 presidential election. *See* 42 U.S.C. §§ 1973b(b), 1973b(f)(3), 1973c. In South Dakota, Shannon and Todd counties became covered jurisdictions by reason of the 1975 amendment. *See* 28 C.F.R. pt. 51 app. (list of covered jurisdictions); 41 Fed. Reg. 784 (Jan. 5, 1976).

Section 5 is an "uncommon exercise of congressional power" intended to prevent covered jurisdictions from "contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees." *South Carolina v. Katzenbach*, 383 U.S. 301, 334–35, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). The statute applies to changes in "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." 42 U.S.C. § 1973c. Consistent with the purpose to frustrate discriminatory contrivances, the Supreme Court "has made clear that minor, as well as major, changes require preclearance." *Young v. Fordice*, 520 U.S. 273, 284, 117 S.Ct. 1228, 137 L.Ed.2d 448 (1997); *see Allen v. State Bd. of Elections*, 393 U.S. 544, 566–68, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). If § 5 applies, a voting change may not be implemented until the voting change receives preclearance—either no objection by the United States

Attorney General after the change has been submitted for his review, or a declaratory judgment by a three-judge panel of the United States District Court for the District of Columbia that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or language minority status. 42 U.S.C. § 1973c; *see Lopez v. Monterey County, Cal.,* 519 U.S. 9, 20, 117 S.Ct. 340, 136 L.Ed.2d 273 (1996).

In this case, South Dakota concedes, as it must, that if redistricting caused a voting change in Shannon or Todd county, that voting change must be precleared.[1] The State has not submitted the 2001 Plan to the Attorney General or the District of Columbia District Court for preclearance. Like the 1991 Plan, the 2001 Plan places Shannon and Todd counties in Senate District 27. The State sought preclearance for District 27 before the 2001 Plan was enacted, but the Attorney General will not consider pre-enactment submissions. *See* 28 C.F.R. § 51.22(a). After the 2001 Plan was enacted, the State concluded that preclearance is not required because the 2001 Plan is not a voting change in Shannon and Todd counties for purposes of § 5. Thus, the issues before us are (i) whether preclearance is required because the 2001 Plan includes a change in voting that affects Shannon and Todd counties within the meaning of § 5, and if so, (ii) whether the State is required to submit the Plan for preclearance, and (iii) to what injunctive relief are plaintiffs entitled. *See City of Lockhart v. United States,* 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983).

## II. Whether Preclearance Is Required.

It is well settled that a reapportionment plan is a "voting procedure, standard or practice" within the meaning of § 5. *See Georgia v. United States,* 411 U.S. 526, 531–35, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973). Likewise, it is settled that the baseline to determine whether a change has occurred for purposes of § 5 is "the status quo that is proposed to be changed," here, the precleared 1991 Plan. *Reno v. Bossier Parish Sch. Bd.,* 528 U.S. 320, 334, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000). The Supreme Court has also clarified that § 5 only bars changes that would "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). As the Court recently observed, § 5 "prevents nothing but backsliding." *Bossier Parish,* 528 U.S. at 335, 120 S.Ct. 866.

■ This court plays only a limited role in enforcing § 5. The statute vests exclusive preclearance authority in the Attorney General and the District of Columbia District Court. Accordingly, we lack authority to decide the merits of whether any voting change in the 2001 Plan had the purpose or will have the effect proscribed by § 5. *See Perkins v. Matthews,* 400 U.S. 379, 385, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). Thus, our inquiry is limited but significant—to determine whether a change "in voting" that affects a covered jurisdiction has been adopted that has the *potential* for retrogressive discrimination. *See Presley v. Etowah County Comm'n,*

---

**1.** South Dakota voluntarily submitted its 1991 Plan, and the Attorney General precleared that Plan in a letter stating:

The Attorney General does not interpose any objection to this redistricting plan. In this regard, we note that *voting changes adopted by the state are subject to Section 5*

*review to the extent they affect the state's two covered counties, Todd and Shannon.*

April 10, 1992, letter from Assistant Attorney General John R. Dunne to South Dakota Deputy Attorney General Wade A. Hubbard (emphasis added).

502 U.S. 491, 501–03, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992); *N.A.A.C.P. v. Hampton County Election Comm'n*, 470 U.S. 166, 181, 105 S.Ct. 1128, 84 L.Ed.2d 124 (1985).

■ Plaintiffs argue that two demographic changes affect the new District 27 and require its submission for § 5 preclearance. First, Native Americans comprised 87 percent of the total population and 82 percent of the voting-age population of District 27 in the 1990 census, upon which the 1991 Plan was based, but Native Americans are 90 percent of the total population and 86 percent of the voting-age population in the 2000 census, upon which the 2001 Plan was based. (Defendants submit somewhat different figures, but the differences are *de minimis* for our purpose.) Second, District 27 was underpopulated by 4.1 percent in the 1991 Plan and was the sixth most underpopulated district, whereas District 27 is overpopulated by 4 percent in the 2001 Plan and is the third most overpopulated district.

Given the Supreme Court's mandate that even minor changes must be precleared, we conclude that these demographic shifts render the new District 27 a change "in voting" for the voters of Shannon and Todd counties that must be precleared under § 5. The State vigorously argues that this was not a retrogressive change prohibited by § 5. But it is not our task to decide the merits of that issue—that is for the Attorney General or the District of Columbia District Court to decide. Either would doubtless decide the merits of this issue on a far more comprehensive record than has been submitted to this court. *See* 28 C.F.R. § 51.27 (required contents of a preclearance submission).

### III. The Appropriate Remedy.

■ "If a voting change subject to § 5 has not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting implementation of the change." *Lopez*, 519 U.S. at 20, 117 S.Ct. 340. The scope of our remedy, however, must be sufficient to ensure that South Dakota expeditiously submits its 2001 Plan for preclearance. *See Lopez*, 519 U.S. at 21, 117 S.Ct. 340. There are four alternatives available to secure this end. First, an injunction prohibiting implementation of the entire 2001 Plan could be issued. Second, an injunction prohibiting implementation of the 2001 Plan in District 27 and District 26 could be issued. Third, an injunction prohibiting implementation of the 2001 Plan in District 27 only could be issued. *Lopez*, 519 U.S. at 20, 117 S.Ct. 340. Fourth, the defendants could be directed to submit the 2001 Plan for preclearance within thirty days. *See Berry v. Doles*, 438 U.S. 190, 192–93, 98 S.Ct. 2692, 57 L.Ed.2d 693 (1978).

■ The first alternative, enjoining the entire 2001 Plan, is endorsed by the United States Attorney General. The problem with this solution is two-fold. First, this method provides greater relief than the plaintiffs requested. Second, this remedy unnecessarily interferes with state redistricting, which is contrary to the principles of federalism. *See Upham v. Seamon*, 456 U.S. 37, 42–43, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982).

■ The second alternative, enjoining Districts 26 and 27, is requested by plaintiffs. They argue that our injunction should include District 26, which borders District 27, because District 26 contains a sizeable Native American population, and any § 5 objection to District 27 "would almost certainly require District 26 to be changed." However, this contention ignores the limited nature of § 5 relief:

In § 5 preclearance proceedings—which uniquely deal only and specifically with *changes* in voting procedures—the baseline is the status quo that is proposed to be changed: If the change "abridges the

right to vote" relative to the status quo, preclearance is denied, and the status quo (however discriminatory *it* may be) remains in effect. *Bossier Parish,* 528 U.S. at 334, 120 S.Ct. 866 (emphasis in original). We question whether we may enjoin a voting practice in District 26, an uncovered jurisdiction, simply because a § 5 remedy *might* in the future affect that jurisdiction. In these circumstances, we limit our injunction to District 27.

■ The third alternative, enjoining District 27, is less burdensome on the State and protects federalism principles. The problem with this solution, however, is it validates the right without providing a remedy. Enjoining District 27 validates the plaintiffs' § 5 challenge, but does nothing to ensure that the State expeditiously seek preclearance. If the State refuses to seek preclearance, "the sole consequence of failing to obtain preclearance is a continuation of the status.quo." *Bossier Parish,* 528 U.S. at 335–36, 120 S.Ct. 866. Here, the status quo for District 27 is the 1991 Plan. The 1991 Plan utilizes geographic boundaries that are virtually identical to the 2001 Plan. Consequently, there is no incentive for the State to comply with federal law by seeking preclearance.

■ The fourth alternative is an injunction prohibiting the State from implementing its 2001 Plan with regard to District 27 together with an order directing the State to submit its 2001 Plan for preclearance within thirty days. An order that requires the appropriate officials to act within thirty days is within the court's discretion. *See Berry,* 438 U.S. at 191, 98 S.Ct. 2692. This solution, as proposed by the plaintiffs, is the appropriate solution for two reasons. First, this solution does minimal damage to federalism principles as the Attorney General assures the court that a review of this issue could be concluded well in advance of the sixty-day statutory deadline.

The second benefit of issuing such an order is that it ensures that the State will not be permitted to evade § 5's preclearance requirement with ease. *See N.A.A.C.P. v. Hampton County Election Comm'n,* 470 U.S. at 178, 105 S.Ct. 1128.

■ The State argues that an order to submit its plan for preclearance is not an appropriate remedy because a partially-covered state has no affirmative § 5 preclearance obligation. We disagree. It is undisputed that § 5 preclearance is required where a noncovered state effects voting changes in covered counties. *See Lopez,* 525 U.S. at 280, 119 S.Ct. 693. The only dispute is who has the obligation to submit the plan for preclearance.

To determine whether the State has the obligation to submit the plan for preclearance, first.we look to the plain meaning of the words employed by Congress in the statute itself. *See United States ex rel. Harlan v. Bacon,* 21 F.3d 209, 210 (8th Cir.1994). "[W]e· must avoid statutory interpretation that renders any section superfluous and does not give effect to all the words used by Congress." *In re Windsor on the River Assoc., Ltd.,* 7 F.3d 127, 130 (8th Cir.1993) (quoting *In re Oxborrow,* 913 F.2d 751, 754 (9th Cir.1990)).

The Voting Rights Act provides in pertinent part: *"[w]henever a State* or political subdivision with respect ..." to a covered jurisdiction *"shall enact* or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting, different from that [previously] in force, ... *such State* or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment" or secure approval of the Attorney General. 42 U.S.C. § 1973 (emphasis added). To give meaning to every word of the statute, one must assume that when Congress chose the word "State" instead

of "covered county," that Congress did so knowingly and purposefully. Similarly, when Congress used the words "shall enact or seek to administer," Congress intended that either the legislative body that enacted the legislation or the executive body that was responsible for administering the legislation would be responsible for obtaining preclearance.

In South Dakota, the state legislature is required by the state constitution to reapportion its membership every ten years. *See* S.D. Const. art. III. § 5. Each legislative district must consist of compact, contiguous territory with population as nearly equal as practicable, based on the last federal census. *See id.* Under the South Dakota constitution, the state legislature is responsible for enacting legislation to reapportion the legislative districts and it is the South Dakota legislature that has the authority to make the appropriate changes to overcome objections that arise during the preclearance process. Under the plain meaning of the Voting Rights Act, the state of South Dakota is an entity that must secure preclearance from the Attorney General or bring a declaratory judgment action.

This conclusion is consistent with prior decisions of the United States Supreme Court. In *United Jewish Org. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), the Supreme Court assumed that the New York state plan was subject to the Act's preclearance requirements, even though the state was not a covered jurisdiction. *See id.* at 147–48, 97 S.Ct. 996. After the state's efforts to exempt its counties from the Voting Rights Act's coverage were unsuccessful, the Supreme Court found that "it became necessary for New York [State] to secure the approval of the Attorney General or of the United States District Court for the District of Columbia for its 1972 reapportionment statute insofar as

that statute concerned [the covered] Counties." *Id.* at 148–49, 97 S.Ct. 996. This holding was referenced recently by the Supreme Court in *Lopez*, 525 U.S. at 279–80, 119 S.Ct. 693, as support for its conclusion that § 5 preclearance is required where a noncovered state effects voting changes in covered counties. As additional support, *Lopez* also recognized that the Department of Justice had "received more than 1,300 submissions seeking to preclear state laws from the seven States that are currently partially covered," including South Dakota. *Lopez*, 525 U.S. at 280, 119 S.Ct. 693. While *Lopez* did not directly address the issue of whether a partially-covered state has the obligation of submitting a state law to the Attorney General for preclearance, it did recognize that if the state submits a state law for preclearance, that this submission may well serve to preclear a subsequently-enacted county ordinance which was enacted to administer the precleared state law. *See Lopez*, 525 U.S. at 273, 119 S.Ct. 693.

In the past, the State has taken the position that it is the entity responsible for submitting a statewide redistricting plan for preclearance. In an official opinion of the South Dakota Attorney General, former Attorney General William J. Janklow opined that state officials are responsible for making § 5 submissions of state laws, including redistricting, that apply to covered counties. 1977 S.D. Op. Atty. Gen. 175, 1977 WL 36011. This opinion has not been rescinded or withdrawn. In 1991, the State in fact did submit its 1991 Plan to the Attorney General for preclearance. *See supra* note 1. In short, by its plain language, Supreme Court interpretations, and the interpretation of the South Dakota Attorney General, the Voting Rights Act requires the State to submit a reapportionment plan for preclearance with regard to covered counties.

The State relies on *Lopez* to support its contention that State officials do not have affirmative preclearance obligations. *See Lopez,* 525 U.S. at 282, 119 S.Ct. 693. The issue in *Lopez,* however, was whether § 5 preclearance is required where a noncovered state effects voting changes in covered counties. The Court determined that these changes require preclearance. The Court found that § 5 preclearance is required whenever a covered political subdivision "seek[s] to administer" a voting change required by state law, even though the state itself is not a covered jurisdiction. *See id.* The Court specified that it was not addressing the issue of whether the state was obligated to seek preclearance for voting changes that it effects. *See Lopez,* 525 U.S. at 278, 119 S.Ct. 693. Thus, *Lopez* left open the issue that this court must address today.

### IV. Conclusion.

For the foregoing reasons, it is hereby ORDERED, ADJUDGED and DECREED that:

1. South Dakota's 2001 Legislative Redistricting Plan (Senate Bill No. 1, "An Act to provide for the decennial redistricting of the State Legislature," filed Nov. 1, 2001) includes a change with respect to voting in Shannon and Todd counties that must be precleared in accordance with § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.

2. Preclearance has not been obtained. Accordingly, defendant Joyce Hazeltine, in her official capacity as Secretary of State of the State of South Dakota, together with her agents, servants, employees, and all persons in active concert or participation with her, are enjoined from implementing or otherwise administering the 2001 Legislative Redistricting Plan in Senate District 27 unless and until preclearance is obtained in accordance with § 5, either by submission to and no objection by the Attorney General of the United States, or by a ruling from the United States District Court for the District of Columbia.

3. The State is ordered to submit within thirty days the 2001 Plan for approval in accordance with § 5, either by submission to the Attorney General of the United States, or by filing an action with the United States District Court for the District of Columbia.

4. This order constitutes the court's final judgment on plaintiffs' claim under § 5 of the Voting Rights Act (Claim One of their Complaint). The court hereby determines that there is no just reason for delay and directs immediate entry of final judgment on this claim under Rule 54(b) of the Federal Rules of Civil Procedure, it being the court's intent that the remaining claim under § 2 of the Voting Rights Act, 42 U.S.C. § 1973, will hereafter proceed before the district court for the District of South Dakota acting as a single-judge district court.

4. Defendants' motions to dismiss, for an award of attorneys' fees, and to strike the supplemental brief of the United States are denied.

LOKEN, Circuit Judge, dissenting.

On the record before us, I conclude that South Dakota's 2001 legislative redistricting plan is not a change "in voting" with respect to the two South Dakota counties that are covered jurisdictions under § 5 of the Voting Rights Act of 1965. Moreover, even if the 2001 Plan is a covered change that must be precleared in accordance with § 5, I conclude the statute does not authorize this court to affirmatively order the State of South Dakota, a noncovered juris-

diction, to submit the 2001 Plan for preclearance. For these reasons, I respectfully dissent.

## I. Whether Preclearance Is Required.

South Dakota concedes, as it must, that a voting change in Shannon or Todd county must be precleared under § 5. I agree with the majority that a reapportionment plan is a "voting procedure, standard or practice" within the meaning of § 5, and that the baseline to determine whether a change has occurred for purposes of § 5 is "the status quo that is proposed to be changed," here, the precleared 1991 Plan. *See Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000). Like the 1991 Plan, the 2001 Plan places Shannon and Todd counties in Senate District 27. Thus, the question is whether the 2001 Plan includes a change "in voting" that has the *potential* for "backsliding," that is, retrogressive discrimination in Shannon and Todd counties. *See Presley v. Etowah County Comm'n*, 502 U.S. 491, 501–03, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992); *City of Lockhart v. United States*, 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983).

Plaintiffs and the United States argue that legislative reapportionment plans always relate to voting and therefore always must be precleared. I disagree, for this contention reads the requirement of change out of the statute. Many States require that the legislature be reapportioned every ten years. Given our mobile and dynamic society, I share the Attorney General's working assumption that every decennial reapportionment plan adopted in a covered *State* will include changes that could impact voting in a manner that requires § 5 preclearance. But the issue is more problematic in an uncovered State which has covered subdivisions. Here, for example, only two South Dakota counties are covered by § 5, and those counties lie entirely within one of thirty-five legislative

districts. In these circumstances, it is quite possible that a state-wide decennial reapportionment would effect no change "in voting" with the potential for § 5 discrimination in those covered counties.

Plaintiffs press three more fact-intensive arguments for requiring preclearance of the 2001 Plan. Only one is discussed by the majority. In my view, all are unsound.

1. Though the 2001 Plan left all of Shannon and Todd counties in District 27, it made one change to the District 27 boundaries, removing a small portion of Bennett County that was in District 27 under the 1991 Plan. Plaintiffs argue this change is enough to require preclearance. I disagree. Defendants submitted uncontroverted evidence that the parcel in question is owned by the City of Martin and is used as a fire station and polling place. The parcel has no resident voters and no prospect of residential development. This boundary change did not affect Shannon and Todd counties and did not add to or subtract from the potential voters in District 27. Thus, it was not a change "in voting" for purposes of § 5. As the Supreme Court reminded us in *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), "Legislators represent people, not trees or acres."

2. Plaintiffs next argue—and the majority agrees—that two demographic changes in District 27 require submission of the 2001 Plan for § 5 preclearance. First, Native Americans' share of the voting-age population in District 27 increased from 82 percent in the 1990 census, upon which the 1991 Plan was based, to 86 percent in the 2000 census, upon which the 2001 Plan was based.

Second, District 27 was underpopulated by 4.1 percent in the 1991 Plan but is overpopulated by 4 percent in the 2001 Plan. Plaintiffs and the majority cite no authority for the proposition that these demographic shifts render the new District 27 a change "in voting" for purposes of § 5. These *de minimis* demographic changes are not a "standard, practice, or procedure with respect to voting different from" the 1991 Plan that triggers the preclearance requirement under § 5. They cannot possibly be the basis for a finding of retrogressive discrimination against the voters of Shannon and Todd counties.

3. Finally, plaintiffs argue that the 2001 Plan is subject to § 5 preclearance because "a covered jurisdiction has the burden of proving that a voting change does not have a discriminatory purpose." But this argument begs the question whether a change in voting has occurred. Moreover, absent specific facts suggesting bad motive, the argument proves too much. One may always speculate that a legislature has acted from bad motive. Here, plaintiffs have come forward with no evidence of a prohibited legislative purpose, whereas defendants have submitted uncontroverted evidence that a Native American legislator from District 27 was a member of the Legislature's 2001 Redistricting Committee and urged the Committee to keep all of Shannon and Todd counties within District 27.

In *Bossier Parish*, the Supreme Court held (over the Attorney General's objection) "that § 5 does not prohibit preclearance of a redistricting plan enacted with a discriminatory but non-retrogressive purpose." 528 U.S. at 341, 120 S.Ct. 866. The Department of Justice has since announced that it will closely examine the purpose of a plan "[i]n those instances in which a plan is found to have a retrogressive effect, as well as in those cases in which a proposed plan is alleged to have a retrogressive effect but a functional analysis does not yield clear conclusions about the plan's effect." Department of Justice, Guidance Concerning Redistricting and Retrogression Under Section 5, 66 Fed.Reg. 55412, 55413 (Jan. 18, 2001). Thus, plaintiffs' categorical argument as to legislative purpose is inconsistent with both *Bossier Parish* and the Attorney General's application of that decision.

For these reasons, I conclude that the 2001 Plan does not work a change in voting in Shannon and Todd counties that requires § 5 preclearance. In *Bossier Parish*, the Supreme Court declined to read § 5 in a manner that would "exacerbate the substantial federalism costs that the preclearance procedure already exacts." 528 U.S. at 336, 120 S.Ct. 866 (quotation omitted). I would dismiss plaintiffs' § 5 claim.

## II. The Appropriate Remedy.

Even if § 5 preclearance is required, I disagree with the injunctive relief ordered by the majority. "If a voting change subject to § 5 has not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting implementation of the change." *Lopez v. Monterey County*, 519 U.S. at 20, 117 S.Ct. 340. Accordingly, plaintiffs are entitled to an order enjoining defendant Joyce Hazeltine in her official capacity as Secretary of State from implementing the 2001 Plan in Shannon and Todd counties.

However, in this case, broader injunctive relief is clearly unwarranted. "In § 5 preclearance proceedings—which uniquely deal only and specifically with *changes* in

voting procedures—the baseline is the status quo that is proposed to be changed: If the change 'abridges the right to vote' relative to the status quo, preclearance is denied, and the status quo (however discriminatory *it* may be) remains in effect." *Bossier Parish,* 528 U.S. at 334, 120 S.Ct. 866 (emphasis in original). Applying this standard, the 2001 Plan is virtually certain to be precleared because the prior 1991 Plan was precleared, the geographic boundaries of District 27 in the 2001 Plan are unchanged with respect to voting, and the demographic changes in District 27 have no more than a minimal impact on Native American voters in Shannon and Todd counties. In these circumstances, I agree with the majority that we should not enjoin implementation of the entire 2001 Plan, as urged by the United States as amicus,[2] and that our injunction should not include Senate District 26, as urged by plaintiffs. But I disagree with the decision to order the State of South Dakota to submit the 2001 Plan for preclearance. In my view, such relief is neither authorized by the statute nor appropriate.

South Dakota is not a jurisdiction covered by § 5, that is, it is not "a State or political subdivision with respect to which *the prohibitions set forth in section 1973b* ... are in effect." 42 U.S.C. § 1973c. The majority conveniently excises the italicized portion in quoting a portion of the statute, *ante* at p. 1155; inclusion of that limiting phrase destroys the majority's contention that the statute's plain language authorizes a mandatory injunction *requiring* a noncovered State to submit its legislative enactments for preclearance. The statute itself imposes no affirmative § 5 preclearance obligation on uncovered jurisdictions.

In search of supporting precedent where none is to be found, the majority next converts the Supreme Court's background discussion in *United Jewish Org. of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 148–49, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), into a "holding" that in that case it was "necessary for New York," an uncovered State like South Dakota, to obtain preclearance of a reapportionment statute because of its impact on covered counties. In fact, New York had elected to act on behalf of the covered counties in earlier § 5 litigation, so the Supreme Court's decision did not establish that an uncovered State may be *compelled* by a federal court to do so. *See New York ex rel. Bronx and Kings Counties v. United States,* 419 U.S. 888, 95 S.Ct. 166, 42 L.Ed.2d 134 (1974); *United Jewish Org. of Williamsburgh, Inc. v. Wilson,* 510 F.2d 512, 516–17 (2d Cir. 1975). Likewise, as the majority acknowledges, the Supreme Court's second decision in *Lopez v. Monterey County,* 525 U.S. 266, 119 S.Ct. 693, 142 L.Ed.2d 728 (1999), left this an open issue. Though the Court held that § 5 preclearance is required for "a covered county's nondiscretionary efforts to implement a voting change required by state law, notwithstanding the fact that the State is not itself a covered jurisdiction," the Court was careful to note that only the covered county was *required* to seek preclearance be-

---

**2.** The United States asserts without case law support that we may enjoin the entire 2001 Plan because, if the Plan is submitted for § 5 preclearance and the Attorney General objects to its purpose or effect in District 27, "[t]he effect of such an objection is to render the entire plan unenforceable." This assertion is beyond the scope of our present inquiry, but I find it dubious. The Supreme Court

noted nearly thirty years ago that, even when an entire State is the covered jurisdiction, "a State might establish that a reapportionment plan left some districts unaffected by even a minor change with the potential for diluting the value of the Negro vote." *Georgia v. United States,* 411 U.S. 526, 535 n. 7, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973).

fore implementing the state law. 525 U.S. at 278, 282, 119 S.Ct. 693.[3]

Affirmatively requiring South Dakota to comply with a federal statute which does not apply to that State is a far more intrusive equitable remedy than enjoining the State from implementing a statute to the extent it effects a voting change in the covered counties. Given the lack of express authority for this extraordinary remedy in § 5, I conclude we do not have it. And even if we have the authority to issue such an injunction, I would decline to exercise it in this case. "[T]he sole consequence of failing to obtain preclearance is continuation of the status quo." *Bossier Parish*, 528 U.S. at 335–36, 120 S.Ct. 866. The status quo in District 27 is the precleared 1991 Plan for Shannon and Todd counties, which the State may or may not find to be an acceptable basis for conducting future elections.[4] That makes this case very different from *Lopez v. Monterey County*, where there was no practical status quo alternative to preclearance. *See* 519 U.S. at 22, 117 S.Ct. 340.

The majority justifies its extraordinary mandatory injunction because "there is no incentive for the State to comply with federal law by seeking preclearance." *Ante* at p. 1154. But there is little if any basis for this concern given the State's voluntary submission of the 1991 Plan on behalf of its covered counties. Moreover, if both the State and the covered counties did decline to submit the 2001 Plan for pre-

clearance, and if the 2002 elections in South Dakota were then conducted with Senate District 27 governed by the 1991 Plan, that would simply confirm my conclusion that no change in voting has occurred and § 5 preclearance should not have been required.

Based upon a legislative reapportionment that has, at most, a *de minimis* effect on voters in the only two counties covered by § 5, the majority issues a mandatory injunction compelling the State of South Dakota to take action under a federal statute that does not apply to the State. There is no hint in the record that this remedy is needed to fulfill the original purpose of § 5—to prevent South Dakota from "staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down." *Beer v. United States*, 425 U.S. 130, 140, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976) (quoting from the statute's legislative history). I respectfully dissent.

---

**3.** *Accord LaRouche v. Fowler*, 77 F.Supp.2d 80, 86 (D.D.C.1999) ("There has never been a suggestion in *Lopez* or any other decision that any state with covered political subdivisions must preclear all changes; instead, only covered jurisdictions must apply in order to implement changes").

**4.** Plaintiffs argue there is no alternative to preclearance because state and federal law would bar future elections conducted under all or any part of the 1991 Plan. But state law

issues are for the state courts to decide; and the asserted federal law issues do not involve § 5 and hence are not for this three-judge court to decide. Plaintiffs elected not to join appropriate officials of Shannon and Todd counties as defendants, so we may not order them to submit all or any part of the 2001 Plan for § 5 preclearance. Thus, in my view, if § 5 preclearance is required, we should simply enjoin the State from implementing its 2001 Plan in Shannon and Todd counties.